UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **CAROLYN ROBINSON**, <br> 10426 North McClellan Drive <br> Fredericksburg, VA 22408 <br><br> Plaintiff, <br><br> v. <br><br> **LANDMARC REAL ESTATE INC.**, <br> (Virginia SCC Entity ID: 04176038) <br> 3715 Latimers Knoll Ct., PO Box 7268, <br> Fredericksburg, VA, 22408 – 7361 <br><br> And <br><br> **LEE'S CROSSING COMMUNITY ASSOCIATION, INC.**, <br> (Virginia SCC Entity ID: 05811286) <br> 3715 Latimers Knoll Ct, <br> PO Box 7268, Landmarc Real Estate <br> Fredericksburg, VA, 22404-7268 <br><br> Defendants. | Civil Action No. 3:23cv00762 <br><br><br><br><br><br><br><br> **TRIAL BY JURY DEMANDED** |

## COMPLAINT
**(Violation of Virginia and United States Fair Housing Laws)**

COMES NOW, Carolyn Robinson ("Ms. Robinson," or "Plaintiff"), by and through her undersigned counsel, and moves this Honorable Court for judgment against Defendants, Landmarc Real Estate Inc. ("Landmarc"), and Lee's Crossing Community Association, Inc., ("Lee's;" collectively "Defendants"), on the grounds and praying for the relief hereinafter set forth:

1

**Nature of Action**

This action arises from the discriminatory practices of a homeowner's association, ("HOA"), and its affiliate, perpetrated against Plaintiff for no reason other than the color of her skin, her military background, and her physical disabilities. Plaintiff moved into the Lee's Crossing Community (the "Community") in 2016. Plaintiff noticed, over time, that she was eyed by her neighbors with an air of suspicion. She did not receive the warm welcome she was expecting. Neighbors would stand outside her home, staring at her and her property. Neighbors driving by would slow to a crawl only when passing her home, and then speed away.

While this was disconcerting for Plaintiff, she hoped it would pass with time. Then she began receiving violation notices from Defendants. The notices alleged acts that appeared to single Plaintiff out despite Plaintiff observing her neighbors committing similar acts to what she was accused of. What's more, Plaintiff made her own complaints against neighbors based on violations she observed them committing and Defendants chose to ignore these.

When Plaintiff inquired about one of the objectively untenable violations, she was offered the explanation that it was sent to her by mistake. Some of the alleged violations, such as putting her trash cans out for trash pickup a day early, were so absurd in nature that Plaintiff could not shake the feeling that they were issued pretextually and for no legitimate purpose other than harassment, coercion, and sending Plaintiff a message that she did not belong in the Community. Plaintiff filed a complaint against Defendants and her neighbors with the Department of Housing and Urban Development ("HUD") which led to severe backlash, including a racially motivated rope being placed on her property by an unknown individual.

The meritless violation notices compounded with the hostility of Plaintiff's neighbors and the feeling that she was unsafe in the Community became too much for Plaintiff to take and

compelled her to move out. Plaintiff now seeks to recover damages stemming from her moving costs, loss of use and value of her home, inconvenience, the discriminatory conduct Defendants directed towards Plaintiff, and Defendants' forcing Plaintiff to enforce her rights in this Court.

## The Parties

1. Plaintiff, is, and at all times relevant hereto has been, an individual residing at 10426 North McClellan Drive, located in the City of Fredericksburg.

2. Defendant Lee's is, and at all times relevant hereto has been, a nonstock corporation, with a principal place of business located at PO Box 7268, Landmarc Real Estate, Fredericksburg, VA, 22404 - 7268.

3. Defendant Landmarc is, and at all times relevant hereto has been, a stock corporation, with a principal place of business located at 3715 Latimers Knoll Ct, PO Box 7268, Fredericksburg, VA 22408-7361.

## Jurisdiction and Venue

1. This action arises under the laws of the Commonwealth of Virginia.

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as a federal question exists, arising under the laws of the United States.

3. This Court has *in personam* jurisdiction over Defendants in this action pursuant to Fed. R. Civ. P. 4(k)(1)(A) and under Va. Code § 8.01-328.1(A)(1), (2), (3), and (6), in that Defendants are corporations that transact business, supply services and/or things in the Commonwealth of Virginia, Defendants caused tortious injury in the Commonwealth of Virginia, and Defendants have an interest in and/or use and/or possess real property in the Commonwealth of Virginia.

4. Venue is proper in the Eastern District of Virginia, Richmond Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2), and L. Civ. R. 3(B)(4) and (C), because a substantial part of the events

or omissions giving rise to the claims set forth in this Complaint occurred in this judicial District and in this division and Defendants have their principal offices within this division of this District (specifically, in Fredericksburg, Virginia).

## STATEMENT OF FACTS

*The Community*

5. In or about 2016, Plaintiff moved into the Community, at 10426 North McClellan Drive, a collection of residential homes located in Fredericksburg, Virginia.

6. At all times relevant hereto, the neighborhood was made up of a mix of racial identities and socioeconomic backgrounds.

7. The precise ratio of ethnicities in Plaintiff's neighborhood at the time she lived there is unknown.

8. At all times relevant hereto, the Community was governed by Defendant Lee's, a homeowner's association comprised of five members, all of whom appeared to be of Caucasian decent:

    a. Rich Lieberman – President;

    b. Victor Soto – Vice President;

    c. Amber Wells – Secretary; and

    d. Bobby "Skip" Midkiff – Treasurer.

9. On information and belief, Defendant Landmarc provides residential community management services and is headquartered in Fredericksburg, Virginia[1].

---

[1] This information is reflected on Defendant Landmarc's website. *See* Landmarc Real Estate | Community Management in Fredericksburg VA (e-landmarc.com).

10. On information and belief, Defendant Lee's principal office location is the same as Defendant Landmarc's.

11. On information and belief, Defendant Landmarc provides community management services to the Lee's Crossing Community and assists in the operations of Defendant Lee's.

12. At all times relevant to this Complaint, Plaintiff's daughter, Erica Robinson (age 26) and her minor granddaughter, Sophia (age 5) resided with Plaintiff at her home. Plaintiff's daughter helps care for her.

13. At the time of Plaintiff's move into the Community, HOA fees, in the amount of $133.00 were due quarterly, for a total of $532.00 paid in HOA fees annually.

14. At all times relevant hereto, Plaintiff stayed current on her HOA fee payments, with the last quarterly payment due and submitted on April 1, 2020.

*The Neighbors*

15. At the time she moved to the Community, Plaintiff's relationship with her neighbors remained cordial and without complaint.

16. Plaintiff's neighbors have been aware of Plaintiff's status as a disabled veteran and African American since she purchased her residence in the Community in 2016.

17. Plaintiff knows this because she had a conversation with her neighbor Joan Pelk (residing at #10428), in or about 2016, shortly after Plaintiff moved to the Community, regarding medical issues that they each suffer from.

18. Plaintiff has since had numerous conversations with other neighbors living in the community and believes her medical information, which she only shared with one neighbor, has been disseminated to most if not all of the other residents of the community.

19. Beginning in 2017, Plaintiff noticed an increased inquisitiveness of her neighbors into her personal and private affairs, including her sensitive medical information.

20. On information and belief, around the same time she noticed an intensified inquisitiveness amongst her neighbors, Plaintiff became the subject of numerous unfounded investigations and complaints, made to and by Defendants, as well as other invasive actions due to her status as a disabled African American veteran.

*The Complaints and Investigations Against Plaintiff*

21. One such unfounded complaint, made in or about April 2019, pertained to alleged property violations.

22. During the investigation of this complaint, Plaintiff made Defendants aware that many of her neighbors permitted their pets to roam the neighborhood unleashed, allowing them to come and go from her property as they pleased. Plaintiff also mentioned that this exacerbated many of her medical issues.

23. More specifically, Plaintiff suffers from, *inter alia*, (i) interstitial lung disease; (ii) Chronic Obstructive Pulmonary Disease ("COPD"), which entails persistent respiratory symptoms such as coughing and breathlessness: and (iii) Guillian-Barre Syndrome, which is a disorder of the immune system that causes tingling and weakness.

24. As a result, pet fur tends to exacerbate Plaintiff's already debilitating symptoms of her illnesses.

25. Since Plaintiff put Defendants on notice of her medical complications, she has noticed a marked increase in complaints made against her and investigations into her, many of which have resulted in citations being issued.

26. As an example, Plaintiff is limited in her physical capabilities due to her disabilities and many tasks, such as gardening and maintaining the exterior of her home, take longer to complete.

27. Often times, Plaintiff must rely on the assistance of others, such as her daughter, to complete these tasks.

28. Despite being aware of Plaintiff's limitations, Defendants have issued citations to and made investigations of Plaintiff for various issues, including, *inter alia*, pollen on her home.

29. In or around April 2019, Plaintiff received a compliance violation notice from the HOA that she had mildew and dirt forming on the side of her house and garage and was asked to clean it by April 30, 2019, a difficult deadline for Plaintiff to meet given her physical disabilities.

30. Plaintiff has also been receiving notices and violations concerning her trash receptacles at a higher-than-usual rate.

31. On July 11, 2019, Plaintiff received a compliance violation from Lee's Crossing Community Association, Inc. that the trash receptacles were stored in the public on a non-collection day. The trash was scheduled to be picked up on July 12, 2019.

32. On or about September 11, 2019, Plaintiff received a compliance violation that her grass required mowing and that her trash receptacles in the driveway or side of the home should be stored out of sight.

33. Although Plaintiff does not agree with the justifications upon which the complaints have been based, especially given her limitations and disabilities, she has always been respectful and compliant with requests from Defendants.

*Complaints and Investigations Sought by Plaintiff*

34. Though Plaintiff acknowledges that she is not the only African American resident in the community, on information and belief, the complaints made against her and investigations by Defendants are more frequent because of her status as an African American, disabled veteran.

35. Particularly, Plaintiff believes that Defendants have taken measures to investigate and pursue complaints against her rather than those complaints made against her non-African American, non-disabled neighbors.

36. Specifically, Plaintiff has made several complaints regarding her neighbors which have neither been investigated nor followed up on by Defendants.

37. Since moving into the Community in 2016, Plaintiff has witnessed and experienced several violations which she has reported to Defendants.

38. Specifically, in 2016, Plaintiff reported several parking issues to Defendants and spoke with her neighbors regarding parking.

39. In 2017, Plaintiff continued to experience parking issues, issues with unleashed pets, and mail tampering.

40. In 2018, the parking issues and animal issues persisted.

41. What's more, shortly after complaints were made by Plaintiff directly to her neighbors regarding parking and animal issues, she began experiencing continuous mail tampering, including tampering of items sent by the Social Security Administration ("SSA") upon whom Plaintiff relies for benefits related to the care and management of her disabilities.

42. In 2019, many of these same issues continued. Plaintiff has also sent information to the SSA concerning mail tampering, which is believed to have contributed to a denial of benefits to Plaintiff.

43. On or around November 24, 2019, a sensitive parcel intended for Plaintiff was erroneously delivered to her neighbors, Dave Lockard and Christine Luludis (residing at #10423).

44. Following the mis-delivery of the sensitive package, Plaintiff received a call for her neighbor, Judy Joseph ("Ms. Joseph").

45. During the call, and out-of-the-blue, Ms. Joseph began asking Plaintiff specific questions regarding her disabilities, including diagnosis, medication, and history.

46. Not thinking much of the conversation at the time, Plaintiff answered questions as politely as she could and then concluded the phone call.

47. Less than two weeks after the odd interaction with Ms. Joseph, Plaintiff received a letter from the SSA alerting her of issues with her medical benefits as related to her conditions.

48. In part because she had not had trouble with the SSA before, Plaintiff believes that her neighbors may have contributed to her issues with the SSA.

49. Plaintiff subsequently alerted Defendants to her concerns regarding mail tampering, and reiterated her concerns regarding parking and animal issues but Defendants took no action.

*Plaintiff's HUD Complaint and Community Reaction*

50. As a result of the disparate treatment Plaintiff continued to suffer as a resident of the Community, she filed a complaint (the "Complaint") with HUD on or about May 6, 2020.

51. The Complaint detailed many of the same allegations as are reflected in this Verified Complaint.

52. From the date Plaintiff filed the Complaint through December 2020, Plaintiff suffered intense harassment and retaliation as a result of filing the Complaint.

9

53. Specifically, in December 2020, Plaintiff discovered a racially motivated item—a rope—left on her porch. Plaintiff fled her home in terror.

54. In April 2021, the county police contacted one of Plaintiff's family members inquiring as to her whereabouts in what appeared to be a welfare check.

55. Plaintiff made contact with the county officer after the officer indicated that they had four (4) officers and a K-9 ready to knock down her door.

56. Plaintiff notified the officer about the racially motivated item found on her porch and explained that it was the reason she had been unresponsive and not been living at the premises for several months.

57. Plaintiff realized at that time that she could no longer safely live in the Community.

*Plaintiff's Move out of the Community*

58. Plaintiff believed that several of her neighbors, and Defendants, pursued unfounded complaints, investigations, and otherwise impermissibly interfered in her affairs, including her SSA benefits vis-i-vis continuous and ongoing mail-tampering, because of her status as disabled, a military veteran, and African American.

59. Plaintiff was further reconciled to her predicament when she realized that Defendants would neither bother to investigate her complaints nor pursue her investigations similarly owing to her status as disabled, a military veteran, and African American.

60. Plaintiff feared that if she remained in the Community any longer, she would lose her SSA benefits, as a result of the continuous and ongoing mail tampering.

61. Plaintiff also feared that if she remained, she would continue to be subjected to the baseless complaints and investigations against her by Defendants.

62. This was compounded with Plaintiff believing her safety in the Community was compromised when she discovered a racially motivated rope on her property.

63. Plaintiff returned to her home in or about May 2021 to finalize her move out.

64. When Plaintiff returned, she was confronted by several neighbors regarding her whereabouts over the previous months.

65. Plaintiff also learned that one of her neighbors had been collecting her mail and removing it from her mailbox without her consent while she was absent.

66. In June 2021, Plaintiff contacted a real estate agent, and her home was officially listed for sale.

67. Unable to immediately sell her home, Plaintiff received another, related, violation from Defendants which appeared to be a continuing harassment of Plaintiff.

68. Plaintiff was ultimately able to sell her home in December 2021.

69. Plaintiff suffered damages connected to the sale of her home, including, *inter alia*, (i) pecuniary loss between what she paid for the home and what she was able to resell it for ; (ii) damages connected to her move out costs; (iii) loss of use and value of the home when she was forced to flee the home for her own safety; (iv) inconvenience; and (v) pecuniary loss connected to the baseless complaints, notices, and violations issued against her by Defendants.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Virgina Fair Housing Laws – Va Code § 36-96.3.A *et seq*.)
### (As to both Defendants)

70. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Verified Complaint with the same force and vigor as if set out here in full.

71. Plaintiff, an African American with a military background, suffers from numerous disabilities, including, *inter alia*, interstitial lung disease, COPD, and Guillian-Barre Syndrome.

72. These conditions constitute a disability within the meaning of Va Code § 36-96.1:1 because they are physical impairments, affecting, *inter alia*, Plaintiff's respiratory system, that substantially limit one or more of Plaintiff's major life activities, including caring for herself, performing manual tasks, walking, and breathing, and Plaintiff possesses records of such impairments.

73. Plaintiff lived in the Community, composed of residences, and overseen and governed by Defendants.

74. Defendants provided various services to Community residents, including enforcement of Community ordinances such as prevention of pollen accumulation and growth of mildew on the exterior of residences, trash receptacle standards governing when trash was to be put out, and other ordinances pertaining to permissible and prohibited acts and practices within the Community.

75. Those ordinances and the enforcement thereof by Defendants were intended to apply equally to all residents, irrespective of their race, occupational background, or the presence of physical and medical disabilities.

76. Notwithstanding the intended applicability of the ordinances, Plaintiff was singled out and targeted by Defendants, as well as by other residents in the community.

77. Plaintiff was subjected to baseless and unfair complaints and investigations.

78. The baseless and unfair complaints and investigations further led to the issuance of citations and violation notices by Defendants.

79. Defendants were aware of Plaintiffs physical limitations and disabilities but chose to cite her for frivolous and trivial allegations including, *inter alia*, not immediately cleaning pollen off her home's exterior and putting her trash receptacles out a day before trash was scheduled to be collected.

80. Despite Plaintiffs non-African American, non-disabled, and non-military neighbors committing similar acts, they were not cited with any violations.

81. What's more, despite Plaintiff notifying Defendants of sanctionable conduct committed by her non-African American, non-disabled, and non-military neighbors, Defendants chose to ignore Plaintiff's complaints and investigative leads, choosing, instead, to focus on Plaintiff's conduct.

82. Plaintiff was targeted and singled out by Defendants because she is African American, because she is disabled, and because she has a military background.

83. When Plaintiff filed a complaint with HUD, alleging the same acts and conduct reflected in this Verified Complaint, Plaintiff discovered a racially motivated item, more specifically a rope, on her property, causing her to flee the Community in fear for her safety.

84. Unable to live in peace and safety in the Community any longer, Plaintiff was forced to sell her home and find alternative living arrangements.

85. Plaintiff has suffered damages as the result of her move out of the community, loss of use and value of her home in the Community, inconvenience, and pecuniary loss stemming from Defendants' subjugation of Plaintiff through the conduit of the baseless and meritless citations and violation notices issued against her.

86. As the result of Defendants' conduct, Plaintiff suffered and continues to suffer significant pecuniary damages in an amount no less than Sixty Thousand Dollars ($60,000.00 USD).

87. The aforementioned acts of Defendants were willful, wanton, malicious, and intentional, and also justify the awarding of punitive damages to Plaintiff in the amount of Three Hundred Fifty Thousand Dollars ($350,000.00 USD) pursuant to Virginia Code § 8.01-38.1.

## COUNT II
### (Violation of the Fair Housing Laws of the United States – 42 U.S.C. § 3604 *et seq.*)
### (As to Both Defendants)

88. Plaintiff hereby incorporates by reference and re-alleges each of the allegations contained in all preceding paragraphs of this Verified Complaint with the same force and vigor as if set out here in full.

89. Plaintiff, an African American with a military background, suffers from numerous disabilities, including, *inter alia*, interstitial lung disease, COPD, and Guillian-Barre Syndrome.

90. These conditions constitute handicaps within the meaning of 42 U.S.C. § 3602 because they are physical impairments, affecting, *inter alia*, Plaintiff's respiratory system, that substantially limit one or more of Plaintiff's major life activities, including caring for herself, performing manual tasks, walking, and breathing, and Plaintiff possesses records of such impairments.

91. Plaintiff lived in the Community, composed of residences, and overseen and governed by Defendants.

92. Defendants provided various services to Community residents, including enforcement of Community ordinances such as prevention of pollen accumulation and growth of mildew on the exterior of residences, trash receptacle standards governing when trash was to be put out, and other ordinances pertaining to permissible and prohibited acts and practices within the Community.

93. Those ordinances and the enforcement thereof by Defendants were intended to apply equally to all residents, irrespective of their race, occupational background, or the presence of physical and medical disabilities.

94. Notwithstanding the intended applicability of the ordinances, Plaintiff was singled out and targeted by Defendants, as well as by other residents in the community.

95. Plaintiff was subjected to baseless and unfair complaints and investigations.

96. The baseless and unfair complaints and investigations further led to the issuance of citations and violation notices by Defendants.

97. Defendants were aware of Plaintiffs physical limitations and disabilities but chose to cite her for frivolous and trivial allegations including, *inter alia*, not immediately cleaning pollen off her home's exterior and putting her trash receptacles out a day before trash was scheduled to be collected.

98. Defendants refused to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford Plaintiff equal opportunity to use and enjoy her residence.

99. Despite Plaintiffs non-African American, non-disabled, and non-military neighbors committing similar acts, they were not cited with any violations.

100. What's more, despite Plaintiff notifying Defendants of sanctionable conduct committed by her non-African American, non-disabled, and non-military neighbors, Defendants chose to ignore Plaintiff's complaints and investigation leads, choosing, instead, to focus on Plaintiff's conduct.

101. Plaintiff was targeted and singled out by Defendants because she is African American, because she is disabled, and because she has a military background.

102. When Plaintiff filed a complaint with HUD, alleging the same acts and conduct reflected in this Verified Complaint, Plaintiff discovered a racially motivated item, more specifically a rope, on her property, causing her to flee the Community in fear for her safety.

103. Unable to live in peace and safety in the Community any longer, Plaintiff was forced to sell her home and find alternative living arrangements elsewhere.

104. Plaintiff has suffered damages as the result of her move out of the community, loss of use and value of her home in the Community, inconvenience, and pecuniary loss stemming from Defendants' subjugation of Plaintiff through the conduit of the baseless and meritless citations and violation notices issued against her.

105. As the result of Defendants' conduct, Plaintiff suffered and continues to suffer significant pecuniary damages in an amount no less than Sixty Thousand Dollars ($60,000.00 USD).

106. The aforementioned acts also justify the awarding of punitive damages to Plaintiff in the amount of Five Hundred Thousand Dollars ($500,000.00 USD), plus costs, interest, and attorneys' fees pursuant to 42 U.S.C. § 3613(c).

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby requests a jury trial for all issues triable by jury including, but not limited to, those issues and claims set forth in any amended complaint or consolidated action.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court grant the following relief:

a. Compensatory damages of at least $60,000.00;

b. Punitive damages in the amount of $350,000.00 pursuant to Virginia Code § 8.01-38.1., or $500,000.00 pursuant to 42 U.S.C. § 3613(c);

c. Attorneys' fees (or consideration of such fees in determining punitive damages), costs, of this action, to the extent permitted by law;

d. Pre- and post-judgment interest; and

e. Such other or further relief as this Court deems just and proper.

Date: November 13, 2023,                                Respectfully submitted,

By: /s/ _____
Robert Powers, Esq. (VSB# 80822)
Tyler M. Roth Esq. (VSB# 93740)
MCCLANAHAN POWERS, PLLC
3160 Fairview Park Drive, Suite 410
Falls Church, VA 22042
Telephone: (703) 520-1326
Facsimile:  (703) 828-0205
Email: rpowers@mcplegal.com
          troth@mcplegal.com
          mmurawiec@mcplegal.com
*Counsel for Plaintiff*

## CERTIFICATE OF TRANSMISSION

I hereby certify that the forgoing COMPLAINT with referenced EXHIBITS, if any, is being electronically transmitted on the date noted below via the CM/ECF system of the U.S. District Court for the Eastern District of Virginia at https://ecf.vaed.uscourts.gov/. The requisite filing fee of $400.00 and any additional fees related to this matter are being charged to an American Express credit card concurrently with this filing.

Date: November 13, 2023,          By: /s/ _____
                                  Robert Powers, Esq.
                                  One of the Attorneys for Plaintiff

17